**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

JACK GERRITSEN, aka Jack
Cerritsen; Jack Geritsen; Jack
Gerrioten; Jack Gerristen; Jack
Gerriten; Jack Gerritens; Jack
Cerritnes; Jack Gerritson; Pancho
Villa,
            *Defendant-Appellant.*

No. 06-50552

D.C. No.
CR-05-00466-
RGK-1

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
January 13, 2009—Pasadena, California

Filed July 10, 2009

Before: Stephen S. Trott, Andrew J. Kleinfeld, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

8541

## COUNSEL

Daniel B. Levin, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Elizabeth A. Newman, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant.

## OPINION

IKUTA, Circuit Judge:

Jack Gerritsen was convicted after representing himself in a federal criminal trial. He argues on appeal that he did not knowingly and intelligently waive his right to counsel because, at the time of the waiver, he was not aware of the maximum penalties he faced and was not informed of the dangers and disadvantages of self-representation. We hold that Gerritsen waived his right to counsel knowingly and intelligently, and we affirm his conviction.

I

Gerritsen is an amateur-radio enthusiast with a history of transmitting illegal radio broadcasts. In 2000, Gerritsen was convicted in a California court for interfering with police radio communications. He spent a year in state prison for this offense. Following his release, Gerritsen applied for an amateur-radio license from the Federal Communications Commission (FCC). The FCC initially granted the license, but later revoked it upon learning of Gerritsen's prior state conviction. In addition to revoking his license, the FCC sent Gerritsen a warning letter advising him to discontinue his radio transmissions and informing him of "severe" criminal penalties if he failed to do so.

But Gerritsen continued to transmit. He proceeded to commit a variety of offenses, including broadcasting over a police frequency, interfering with a Coast Guard search and rescue operation, transmitting over a line the Red Cross was using to evacuate a town downstream of a cracked dam, and interfering with a Homeland Security disaster preparedness exercise being conducted over a military radio system.

On May 17, 2005, Gerritsen was charged in a six-count indictment with: (1) one count of malicious interference with

a military radio system under 18 U.S.C. § 1362 (providing a maximum sentence of ten years); (2) two counts of malicious interference with a licensed or authorized radio communication under 47 U.S.C. § 333; and (3) three counts of transmitting without a license under 47 U.S.C. § 301. (Both § 333 and § 301 are made punishable by 47 U.S.C. § 501, which provides a maximum sentence of one year if the defendant has not previously been convicted under the Communications Act of 1934, 48 Stat. 1064, and two years if he has been.)

On July 7, 2005, Gerritsen attended a status conference and learned that the district court could not accommodate his desire for an early trial date. When the district judge indicated that the trial would likely be rescheduled from that week to early November, Gerritsen's court-appointed counsel told the court, "I believe [Gerritsen's] decision is that if that's the only date that's available then he would ask for a shorter date and ask to represent himself." The district judge responded: "He always has the right to represent himself. It's like asking somebody to do their own brain surgery but you have a right to do it. I always advise against it. It's absolutely your right[,] if you wish to relieve counsel and represent yourself you may do so." After Gerritsen conferred with his counsel he again expressed his desire to represent himself. The district judge responded:

> You understand that you have a right to have an attorney and the court has provided one for you and would continue to provide one for you.
>
> If you wish to waive and give up that right and you feel comfortable representing yourself that's fine. You have got that right.
>
> I've got to advise you and I'm sure you understand what I'm about to say, it's very dangerous and normally very foolish to represent yourself because there's a lot of legal issues that come up. The court

cannot help you at all. I treat you just like another attorney. I would have to be impartial on that.

There may be a lot of things that you may or may not realize or a lot of pitfalls that you might . . . be getting into trouble on. And it might affect the decision on this case, which could be adverse to you, you understand?

Gerritsen replied, "I do, Your Honor."

The district judge then asked the prosecutor to state what the maximum penalty would be. The government correctly listed each charge against Gerritsen but incorrectly stated that the total maximum penalty was 22 years of imprisonment. After this recitation, the district judge addressed Gerritsen: "So I want to make sure . . . before you make that final decision you understand the maximum possible punishment, in other words, you're risking or playing with 22 years of your life." When the district judge asked Gerritsen if he understood that, Gerritsen responded, "I understand, Your Honor."

The district judge again warned Gerritsen against representing himself: "I would have to treat you like any other attorney. I can't help you. I can't ask questions for you or participate in the case at all. You would be on your own." The district judge then repeated: "If you really want to do that with the understanding you are looking at 22 years possible maximum punishment on this and you're comfortable doing that, it's your right."

In response to the court's admonitions, Gerritsen responded, "Your Honor, I do have some experience. I would like to proceed pro se." Gerritsen had, in fact, represented himself in at least nine state criminal cases, including six jury trials that resulted in convictions.

Following yet another reaffirmation of Gerritsen's desire to proceed pro se, the court asked the prosecutor to "state the

elements of the charges and the nature of the charges that are pending so that [Gerritsen] is put on notice." In response, the prosecutor recited the elements the government had to prove for each of the three statutes charged in the indictment. The district judge asked whether Gerritsen understood the elements and charges:

> THE COURT: Okay. Do you understand those elements and charges in this case?
>
> THE DEFENDANT: Yes.
>
> THE COURT: If you have questions ask them now.
>
> THE DEFENDANT: I understand Your Honor. I read the Indictment.
>
> THE COURT: You're satisfied you understand what the charges are and what the elements of the charges are.
>
> THE DEFENDANT: Yes, I do.

The district judge followed by asking Gerritsen if he wanted more time to speak with his attorney. Even then, Gerritsen indicated that he "want[ed] to proceed." Once again, the district judge asked, "You wish to waive and give up your right to have an attorney?" Gerritsen replied, "Yes, Your Honor." The district judge concluded by appointing Gerritsen's former counsel as standby counsel (who later withdrew, citing ethical objections). In doing so, the judge told Gerritsen that his former counsel could not act as advisory counsel. A final time, the district judge asked if Gerritsen wished to represent himself, and once again Gerritsen expressly replied that he did. The district judge then allowed Gerritsen to proceed pro se.

On October 21, 2005, three and a half months later and six weeks before trial, the government filed a first superseding

indictment, adding an allegation of willfulness to each of the three counts of violating 47 U.S.C. §§ 301, 501. Gerritsen appeared before a magistrate judge for his post-indictment arraignment. At the beginning of the proceeding, the magistrate judge asked, "Mr. Gerritsen, do you still intend to represent yourself?" Gerritsen replied, "Yes, Your Honor." Gerritsen then entered a plea of not guilty. Following the plea, the government asked the court for permission to "go over the nature of the charges and the maximum penalty." After describing the elements of each charge, the government correctly explained the maximum statutory penalty that Gerritsen could face:

> With respect to the possible penalties, your Honor, the statutory maximum sentence that the Court can impose for violation of [18 U.S.C. § 1362] is ten years imprisonment, a three-year period of Supervised Release, and a fine of $250,000 and a mandatory Special Assessment of $100. The statutory maximum sentence that the Court can impose under [47 U.S.C. § 501] on each of the remaining counts of the Indictment is one year in prison or two years if the Defendant has previously been convicted of an offense under Section 501, a one-year period of Supervised Release, a 10,000-dollar fine and a 25-dollar Special Assessment. Therefore, the total maximum sentence that the Court can impose is 20 years imprisonment, a three-year period of Supervised Release, a 300,000-dollar fine and a 225-dollar Special Assessment.

This was the first time Gerritsen had been told the correct statutory maximum: 20 years, not 22. The prosecutor noted (and the magistrate judge confirmed) that "the Court has already asked the Defendant if he still intends to represent himself." Gerritsen made no further comment regarding his waiver of the right to counsel, and he continued to act as his own representative for the remainder of the hearing.

Gerritsen represented himself at trial and was convicted. He was represented by counsel at sentencing. His Guidelines range was 33-41 months; the district court sentenced him to 84 months in prison, followed by three years of supervised release.

## II

On appeal, Gerritsen does not challenge his sentence. Instead, he argues that he did not knowingly and intelligently waive his right to counsel. Specifically, Gerritsen argues that his waiver of the right to counsel was not knowing and intelligent because, at the time he elected to proceed pro se, he had not been adequately informed of either: (1) the possible penalties he faced or (2) the dangers and disadvantages of self-representation. *See United States v. Balough*, 820 F.2d 1485, 1487 (9th Cir. 1987). Because his waiver was inadequate, Gerritsen argues, he was convicted in violation of the Sixth Amendment, and we must reverse his conviction and remand for a new trial. *See United States v. Forrester*, 512 F.3d 500, 508-09 (9th Cir. 2008, *as amended*). We review the validity of a waiver of the right to counsel de novo. *Id.* at 506. "[T]he burden of establishing the legality of the waiver is on the government." *Id.*

## A

**[1]** The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has interpreted the Sixth Amendment as guaranteeing "that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." *Faretta v. California*, 422 U.S. 806, 807 (1975). But the Sixth Amendment also guarantees a criminal defendant the constitutional "right to proceed without counsel when he voluntarily and intelligently elects to do so." *Id.* Spe-

cifically, the Constitution does not allow the government "[t]o thrust counsel upon the accused, against his considered wish," *id.* at 820, in contravention of the "nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so," *id.* at 817.

A defendant therefore has two correlative and mutually exclusive Sixth Amendment rights: the right to have counsel, on one hand, and the right to refuse counsel and represent himself, on the other. *See United States v. Harris*, 683 F.2d 322, 324 (9th Cir. 1982) ("[T]here is a narrow path to be carefully treaded between the *Faretta* right to refuse the assistance of counsel, and the assurance that the defendant's refusal of such services is made with full awareness of the risks of doing so.").

**[2]** Because a defendant who exercises the right to self-representation foregoes the benefits of exercising the right to counsel, "the accused must 'knowingly and intelligently' forego those relinquished benefits." *Faretta*, 422 U.S. at 835. When a defendant elects to waive the right to be represented by trial counsel, "[w]arnings of the pitfalls of proceeding to trial without counsel . . . must be rigorously conveyed." *Iowa v. Tovar*, 541 U.S. 77, 89 (2004) (internal quotation marks and alterations omitted). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (internal quotation marks omitted). The defendant must be aware of "the nature of the charges and the possible penalties." *Harris*, 683 F.2d at 324; *accord Balough*, 820 F.2d at 1487. He must also understand his "constitutional right to have a lawyer perform certain core functions," and "the possible consequences of mishandling

these core functions and the lawyer's superior ability to handle them." *United States v. Mohawk*, 20 F.3d 1480, 1484 (9th Cir. 1994) (internal quotation marks and alterations omitted).

The Supreme Court has expressly declined to "prescribe[ ] any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Tovar*, 541 U.S. at 88; *see also United States v. Erskine*, 355 F.3d 1161, 1168 (9th Cir. 2004) ("[W]e have never required district courts to recite a particular script when making their inquiry . . . ."). Rather, "[t]he information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Tovar*, 541 U.S. at 88. Even if the defendant "lacked a full and complete appreciation of all of the consequences flowing from his waiver, it does not defeat the State's showing that the information it provided to him satisfied the constitutional minimum." *Id.* at 92 (internal quotation marks omitted). The "information a defendant must have to waive counsel intelligently will depend, in each case, upon the particular facts and circumstances surrounding that case." *Id.* (internal quotation marks omitted).

**[3]** Accordingly, although it is "only the rare case in which an adequate waiver will be found on the record in the absence of a specific inquiry by the trial judge," the failure of the district court to engage in a colloquy with the defendant cannot itself be reversible error. *Balough*, 820 F.2d at 1488 (quoting *United States v. Aponte*, 591 F.2d 1247, 1250 (9th Cir. 1978) (alteration omitted)). We have explained that a defendant's waiver must be evaluated in light of the record as a whole:

> A waiver of counsel cannot be knowing and intelligent unless the accused appreciates the possible consequences of mishandling the[ ] core functions [of the trial lawyer] and the lawyer's superior ability to

perform them. Our task is to determine from the record whether the accused understood these risks when he elected to represent himself. We prefer trial courts to simplify our review by explaining the risks of self-representation to the accused. However, because the test concerns what the accused understood rather than what the court said or understood, explanations are not required.

*United States v. Kimmel*, 672 F.2d 720, 721-22 (9th Cir. 1982); *see also Balough*, 820 F.2d at 1488 (citing cases). When the district court has not made a waiver inquiry, "we must consult the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused" to determine whether the waiver was knowing and intelligent. *Kimmel*, 672 F.2d at 722 (internal quotation marks omitted); *accord Balough*, 820 F.2d at 1488. Our precedents thus apply the Supreme Court's instruction that our fundamental task is to determine whether a defendant who invokes his right under *Faretta* "knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (internal quotation marks omitted). Our "focus should be on what the defendant understood, rather than on what the court said or understood." *United States v. Lopez-Osuna*, 232 F.3d 657, 664-65 (9th Cir. 2000).

Once the defendant has validly waived the right to counsel, "although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' " *Faretta*, 422 U.S. at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)). The Supreme Court has stated that, even if "the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant," *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984), it merits the same vigilant protection as other constitutional rights. "When the administration of the criminal law is hedged about as it is by

the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards is to imprison a man in his privileges and call it the Constitution." *Faretta*, 422 U.S. at 815 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 280 (1942) (alterations omitted)).

Because the right to self-representation protects the "dignity and autonomy of the accused," *Wiggins*, 465 U.S. at 177, we cannot ignore or diminish the importance of this right merely because the defendant's efforts at trial were unsuccessful. Nor may we second-guess, after the fact, whether the defendant would have been better served by counsel. The Supreme Court has noted that the right of self-representation allows "the presentation of what may, at least occasionally, be the accused's best possible defense." *Id.* Most recently, in declining to overrule *Faretta*, the Court cited "recent empirical research" finding that pro se state felony defendants "appear to have achieved higher felony acquittal rates than their represented counterparts." *Indiana v. Edwards*, 128 S. Ct. 2379, 2388 (2008) (internal quotation marks omitted). In considering whether Gerritsen has effectively waived his right to counsel, we must avoid the tendency of hindsight to diminish the importance of Gerritsen's corresponding right to self-representation.

B

Applying these principles to Gerritsen's claims, we first consider his argument that his waiver was not knowing and intelligent because he was not accurately informed of the possible penalties at the time he elected to represent himself. As noted above, the prosecutor originally informed Gerritsen at a status conference that he faced a maximum penalty of 22 years. At the post-indictment arraignment, the prosecutor informed Gerritsen that he faced a maximum sentence of 20 years.

Gerritsen now argues that the maximum penalty he faced was 15 years, not 20 or 22 years. Gerritsen was indicted for five counts of violating § 501 (three § 301 violations and two § 333 violations). Section 501 increases the maximum prison sentence for willful and knowing violations of 47 U.S.C. §§ 301 and 333 from one year to two years for "any person, *having been once convicted of an offense punishable under this section*, who is subsequently convicted of violating any provision of this chapter punishable under this section." 47 U.S.C. § 501 (emphasis added). Gerritsen argues that he lacked a qualifying prior conviction and therefore faced a maximum of five years' imprisonment on the five § 501 counts, for a total maximum sentence of 15 years.

**[4]** We disagree that the prosecutor erred by including the potential five-year enhancement in calculating the maximum penalty to which Gerritsen was exposed. A statutory enhancement for a prior conviction is not an element of the crime. It need not be alleged in the indictment and proven to a jury, but is determined by the court after the defendant has been convicted. *See United States v. Fresnares-Torres*, 235 F.3d 481, 482 (9th Cir. 2000); *see also Almendarez-Torres*, 523 U.S. 224, 247 (1998). Before trial, neither the prosecutor nor the court can authoritatively determine whether sentencing enhancements will affect the sentencing range; therefore, the enhancements must be considered potentially applicable to the defendant. In the analogous context of a Rule 11 plea colloquy, in which the district court must ensure that the defendant understands "the maximum penalty provided by law" before waiving constitutional rights, Fed R. Crim. P. 11(c), we held that the district court did not err in informing the defendant that the maximum penalty included possible enhancements based on prior convictions, *United States v. Barrios-Gutierrez*, 255 F.3d 1024, 1027-28 (9th Cir. 2001) (en banc). We explained that the precise sentence cannot be determined until the sentencing hearing, because the question whether a sentencing enhancement for recidivism applies "depends on the later confirmation of whether or not the defen-

dant has been convicted of the requisite felony." *Id.* at 1027, 1028 n.3. The same reasoning applies here. Accordingly, the prosecutor did not err in including the potential sentencing enhancements in his calculation of the maximum possible penalty provided by law.

**[5]** Second, Gerritsen argues that even if he had a qualifying prior conviction, and the correct maximum penalty was 20 years, his waiver of the right to counsel was not knowing and intelligent because he was not correctly informed of the penalty until after he waived his right to counsel. We disagree. Gerritsen waived his right to counsel in two different proceedings, the July 7 status conference and the October 21 arraignment. Although Gerritsen was not correctly informed of the possible penalties at the status conference stage, he was informed of the correct penalties at the arraignment proceeding, and expressly waived his right to counsel during this proceeding.

In determining whether a waiver is knowing and intelligent, we have explained that the question "is not, broadly, what the record reveals about [the defendant's] understanding of the possible penalty throughout the different stages of the proceedings—pre-trial, trial, and sentencing—but specifically what the defendant understood *at the particular stage of the proceedings at which he purportedly waived his right to counsel.*" *Erskine*, 355 F.3d at 1169 (emphasis in original). In *Erskine*, the defendant waived his right to counsel at the hearing in which his first trial was declared a mistrial, and did not learn of the actual potential penalties (which "quintupled the stakes of self-representation for Erskine") until moments before his second trial was to commence. *Id.* at 1165.

**[6]** By contrast, Gerritsen was informed that the correct maximum penalty was 20 years, rather than 22 years, at the arraignment hearing, the same stage of the process at which he waived his right to counsel, and a stage sufficiently early to give him ample opportunity to reconsider his decision to

represent himself in light of the correct penalty information. Under the totality of the circumstances, and focusing on what Gerritsen understood, not what the court said or understood, we conclude that Gerritsen's waiver of the right to counsel was adequate because Gerritsen understood the correct potential penalties "at the particular stage of the proceedings at which he purportedly waived his right to counsel." *Id.* at 1169.

Gerritsen contends that his waiver at the arraignment hearing was not knowing and intelligent because he stated his intent to represent himself immediately before he was informed of the correct possible penalties, instead of immediately after. We decline to take such a hypertechnical approach to our after-the-fact evaluation of Gerritsen's assertion of his constitutional rights. The record shows that Gerritsen learned that the possible penalty was 20 years, rather than 22 years, just minutes after he reiterated his intention to assert his right of self-representation; he subsequently gave no indication that this two-year error affected his decision but persisted in his self-representation with a full appreciation of the nature of the penalties he faced.

The Supreme Court has directed us to take a "pragmatic approach to the waiver question," and we are mindful of its warning not to establish rigid requirements that must be met before a defendant is deemed to have effectively waived counsel. *Tovar*, 541 U.S. at 90, 92 (rejecting the state court's per se rule on waivers, and stating that the state court "overlooked our observations that the information a defendant must have to waive counsel intelligently will depend, in each case, upon the particular facts and circumstances surrounding that case" (internal quotation marks omitted)); *cf. Illinois v. Gates*, 462 U.S. 213, 231, 235-36 (1983) (disapproving of the "complex superstructure of evidentiary and analytical rules" and "rigid demand that specific 'tests' be satisfied" for determining whether an informant's tip provides probable cause for a search or seizure). We must bear in mind that we are evaluat-

ing not only the waiver of one constitutional right, but the effective invocation of another. *See Faretta*, 422 U.S. at 817 ("[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so."). Based on the record before us, we conclude that Gerritsen understood the potential penalties at the stage in the proceeding when he waived his right to counsel. To hold otherwise would place too great a burden on his right to self-representation, and would be contrary to the approach mandated by *Tovar*.

C

**[7]** Gerritsen further argues that his waiver of the right to counsel was not knowing and intelligent because he was not adequately informed of the "dangers and disadvantages of self-representation." *Faretta*, 422 U.S. at 835. While the district court did not engage in a lengthy colloquy with Gerritsen on this issue, the court did highlight for Gerritsen many of the key disadvantages of proceeding pro se that we have previously identified. *See United States v. Hayes*, 231 F.3d 1132, 1138-39 (9th Cir. 2000) (providing guidance on how a district court could describe the "dangers and disadvantages" of self-representation, as required by *Faretta*). The district court warned Gerritsen that he would be treated "like any other attorney," and that the court would not help him or "ask questions for you or participate in the case at all." *Cf. id.* at 1138-39 & n.4 (advising the district courts to tell prospective pro se litigants, "you will have to abide by the same rules in court as lawyers do. . . . you will be given no special privileges or benefits, and the judge will not help you"). The district court informed Gerritsen that he would be facing difficult legal issues, that he would be at a disadvantage due to his ignorance of the law, and that he would face numerous "pitfalls" that could affect the outcome of his case. *Cf. id.* at 1139 & n.4 (advising the district court to tell a prospective pro se litigant that the government is represented by "a trained, skilled prosecutor who is experienced in criminal law and

court procedures," and the defendant will be exposed to the dangers and disadvantages of not knowing litigation procedure.)

Gerritsen claims, however, that the district court's discussion fell short of the Sixth Amendment's requirements because the district court did not advise him of his right to have a lawyer perform certain "core functions" or ensure that he "appreciate[d] the possible consequences of mishandling these core functions and the lawyer's superior ability to handle them." *Mohawk*, 20 F.3d at 1484 (quoting *Kimmel*, 672 F.2d at 721). Gerritsen focuses on the district court's failure to advise him, in detail, that he would be handicapped in selecting a jury, making an opening statement, introducing admissible evidence, conducting direct and cross-examination of witnesses, making motions to protect his rights on appeal, and making an appropriate closing argument. *See Hayes*, 231 F.3d at 1138-39.

As discussed above, it is well established that the district court had no obligation to recite a particular script in order to advise Gerritsen of a lawyer's core functions. See *Tovar*, 541 U.S. at 92; *Erskine*, 355 F.3d at 1168. Although "[a] waiver of counsel cannot be knowing and intelligent unless the accused appreciates the possible consequence of mishandling [the lawyer's] core functions," the question before us is "what the accused understood rather than what the court said or understood." *Kimmel*, 672 F.2d at 721-22. Accordingly, "[o]ur task is to determine from the record whether the accused understood these risks when he elected to represent himself." *Id.* at 721. Doing so requires us to look to "the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *Id.* at 722 (internal quotation marks omitted); *accord Balough*, 820 F.2d at 1488.

[8] The record in this case establishes that Gerritsen had extensive prior experience representing himself in jury trials.

The Presentence Report (PSR), which Gerritsen does not contest, reveals that he represented himself in at least six jury trials in California municipal courts between 1990 and 2005, and at least one federal civil action.[1] Based on this record, in light of his extensive pro se litigation experience, we conclude that Gerritsen was well aware of the core functions of a lawyer when he elected to represent himself. Lawyers arguing misdemeanor criminal jury trials in Los Angeles County Municipal Courts in the 1990s performed the same core functions as lawyers in federal criminal trials: they selected juries, introduced and objected to evidence, cross-examined witnesses, made motions, and preserved legal issues for appeal.[2]

---

[1]According to the PSR, Gerritsen represented himself in misdemeanor jury trials twice in Huntington Park Municipal Court in 1990 and 1993, once in South Gate Municipal Court in 1998, twice in Downey Municipal Court in 1999, once in Long Beach Municipal Court in 1999, and once in "Rio Hondo Muni. Crt." in 2005. Because California merged its Municipal and Superior Courts in 2000, *see People v. Superior Court*, 28 Cal. 4th 798, 804-05 (2002), there was no "Rio Hondo Municipal Court" in 2005, and so we do not rely on this seventh jury trial in our analysis. The federal civil action stemmed from an incident, described in the PSR, in which Gerritsen alleged that he was kidnapped and beaten by Mexican consular officials as a result of his protesting outside the Mexican consulate in Los Angeles. *See Gerritsen v. Consulado General de Mexico*, 989 F.2d 340, 342-43 (9th Cir. 1993) (describing the case's procedural history, including two pro se appeals to this court). Further, our judicial records reflect that Gerritsen represented himself as a plaintiff or petitioner for writ of habeas corpus in at least five additional federal civil actions in the Central District of California, one of which went to trial before a jury. *Gerritsen v. City of Los Angeles*, No. 93-5817 (C.D. Cal. filed Sept. 27, 1993); *Gerritsen v. City of Bell Prosecutor*, No. 93-5870 (C.D. Cal. filed Sept. 29, 1993) (habeas petition); *Gerritsen v. City of Bell*, No. 94-03931 (C.D. Cal. filed June 13, 1994); *Gerritsen v. City of Bell Gardens*, No. 95-1271 (C.D. Cal. filed Mar. 1, 1995); *Gerritsen v. United States*, No. 97-2720 (C.D. Cal. filed Apr. 21, 1997) (jury trial). However, because the parties do not reference these additional five proceedings, we do not rely on them in making our ruling.

[2]Under the California municipal court rules in effect throughout the 1990s, counsel for each party in criminal trials made motions, examined prospective jurors, and proposed jury instructions. *See* Cal. Rules of Court

*Cf. Erskine*, 355 F.3d at 1168 (same core functions except for opening and closing statements). Based on Gerritsen's actual litigation of six jury trials, he undoubtedly had a clear idea of the "possible consequences of mishandling these core functions and the lawyer's superior ability to perform them." *Kimmel*, 672 F.2d at 721. Such firsthand experience provides more insight into the pitfalls of self-representation than any admonition from a court could possibly convey. Accordingly, based on the record before us, we conclude that Gerritsen was "aware of the dangers and disadvantages of self-representation" when he waived his right to counsel. *Faretta*, 422 U.S. at 835.

## III

The right to represent oneself, like the right to counsel, is secured by the Constitution. "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Id.* at 817. Our inquiry, then, must always address the fundamental question whether a defendant truly wants to represent himself, i.e., whether "his choice is made with eyes open." *Id.* at 835. We have been instructed by the Supreme Court not to require a "formula or script" for evaluating a defendant's assertion of his right to self-representation and concomitant waiver of his right to counsel; our approach must be "pragmatic." *Tovar*, 541 U.S. at 87 n.9, 88.

**[9]** Gerritsen's argument, at base, is that the district court made technical errors in the manner in which it gave him information and took his waiver, and that these technical

501.5, 516.1, 516.2, 517 (West 2000). Parties appearing before municipal courts were responsible for preserving issues for appeal. *See, e.g.*, *People v. Komatsu*, 212 Cal. App. 3d Supp. 1, 5 (App. Dep't Super. Ct. 1989) (discussing waiver of issues in an appeal from municipal court). The California Rules of Evidence also applied to municipal courts. *See* Cal. Evid. Code § 300 (West 1995 & Supp. 2009).

errors entitle him (after exercising his right to self-representation and losing at trial) to claim he never validly waived his right to counsel in the first place. Gerritsen argues that he did not fully understand what he was giving up when he asserted his right to self-representation because the district court failed to ask him "do you intend to represent yourself" one last time, and because the district court failed to spell out to him what he already knew: that lawyers in jury trials pick jurors, examine witnesses, object to evidence, and give opening and closing statements. We will not strain the Supreme Court's *Faretta* case law to so hold, nor will we burden the rights of future defendants who wish to invoke their Sixth Amendment right to self-representation. Because Gerritsen was aware of the possible penalties he faced and the dangers and disadvantages of self-representation when he waived his right to counsel at his arraignment on October 21, 2005, we conclude that his waiver was knowing and intelligent. We therefore **AFFIRM** his conviction.